AJC LOGISTICS, LLC, et al., Plaintiffs,

v.

ECONOMY INTERNATIONAL SERVICES, INC., et al., Defendants.

Civil No. 11–1834 (FAB).

United States District Court, D. Puerto Rico.

Sept. 10, 2013.

Manolo T. Rodriguez–Bird, Alejandro Mendez–Roman, Jimenez, Graffam & Lausell, San Juan, PR, for Plaintiffs.

Vicente Santori–Margarida, Pinto–Lugo, Oliveras & Ortiz, PSC, Giancarlo Font–Garcia, Rivera–Carrasquillo, Martinez & Font Law Offices, San Juan, PR, for Defendants.

## MEMORANDUM AND ORDER

BESOSA, District Judge.

Before the Court is the Report and Recommendation ("R & R") of Magistrate Judge Camille L. Velez–Rive, (Docket 77). Having made an independent examination of the entire record in this case, the Court **ADOPTS IN FULL** the magistrate judge's findings and recommendations.

## I. STANDARD

A district court may refer a pending motion to a magistrate judge for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed.R.Civ.P. 72(b); Loc. Rule 72(b). Any party adversely affected by the report and recommendation may file written objections within fourteen days of being served with the magistrate judge's report. Loc. Rule 72(d).[1] *See* 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Ramos–Echevarria v. Pichis, Inc.,* 698 F.Supp.2d 262, 264 (D.P.R. 2010); *Sylva v. Culebra Dive Shop,* 389 F.Supp.2d 189, 191–92 (D.P.R.2005) (citing *United States v. Raddatz,* 447 U.S. 667, 673, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). Failure to comply with this rule precludes further review. *See Davet v. Maccarone,*

---

1. The magistrate judge reduced the period for objections to one week, due to the proximity of the pre-trial conference. (Docket 77 at 562.)

973 F.2d 22, 30–31 (1st Cir.1992); *Borden v. Secretary of H.H.S.*, 836 F.2d 4, 6 (1st Cir.1987). In conducting its review of the R & R, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(a), (b)(1); *Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir.1985); *Alamo Rodriguez v. Pfizer Pharmaceuticals, Inc.*, 286 F.Supp.2d 144, 146 (D.P.R.2003). Furthermore, the Court may accept those parts of the report and recommendation to which the parties do not object. *See Hernandez–Mejias v. General Elec.*, 428 F.Supp.2d 4, 6 (D.P.R.2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility*, 334 F.Supp.2d 114, 125–126 (D.R.I. 2004)). A party's failure to object to an R & R allows the Court to assume that the party agrees with the recommendations in the R & R. *Gonzalez–Santos v. Torres–Maldonado*, 839 F.Supp.2d 488, 500 (D.P.R.2012).

In this case, the magistrate judge issued a thorough and well-written R & R recommending (1) that plaintiffs' motion for summary judgment be **DENIED**; (2) that defendant Triple–S' request for summary judgment regarding the coverage limit be **GRANTED**; and (3) that Triple–S' request to dismiss Lloyd's claim be **GRANTED**. (Docket 77.) The parties had until September 5, 2013 to object to the R & R. Although plaintiffs filed a timely objection, (Docket 78), defendant Triple–S did not, waiving its right to further review in the district court. *See Davet*, 973 F.2d at 30–31. The Court addresses plaintiffs' objections below.

## II. PLAINTIFFS' OBJECTIONS

### A. $25,000 vs. $500,000 Limit of Coverage

■ Plaintiffs first object to "the magistrate judge's proposed findings and recommendations that the Triple–S Policy provides a Limit of Insurance of $25,000.00 for the loss sustained by the plaintiffs as a result of the mechanical breakdown at Economy." (Docket 78 at 6.) They instead contend that the Triple–S Policy provides a limit of $500,000 "for loss suffered under the Personal Property of Others coverage as a result of a mechanical breakdown." *Id.* Plaintiffs' objection is little more than a recitation of the arguments raised before the magistrate judge. Where the objections are repetitive of the arguments already made to the magistrate judge, a *de novo* review is unwarranted. *Westernbank P.R. v. Kachkar*, 2009 U.S. Dist. LEXIS 78726, 25, 2009 WL 2871160, 6 (D.P.R. Sept. 1, 2009) (Delgado–Colon, J.) (citing *Rivera–Garcia v. United States*, 2008 U.S. Dist. LEXIS 60305, 2008 WL 3287236, *1 (D.P.R. Aug. 7, 2008) (Perez–Gimenez, J.)). "Instead, the report and recommendation is reviewed by the district judge for clear error." *Rivera–Garcia*, 2008 U.S. Dist. LEXIS 60305, 2008 WL 3287236 (citing *Camardo v. Gen. Motors Hourly–Rate Emps. Pension Plan*, 806 F.Supp. 380, 382 (W.D.N.Y.1992) ("It is improper for an objecting party to … submit [ ] papers to a district court which are nothing more than a rehashing of the same arguments and positions taken in the original papers submitted to the [m]agistrate [j]udge. Clearly, parties are not to be afforded a 'second bite at the apple' when they file objections to a R & R.")). After due consideration, the Court finds that the R & R is neither clearly erroneous nor contrary to law, and thus it **ADOPTS IN FULL** the magistrate judge's findings.

■ The R & R included a thorough review of Puerto Rico insurance contract law to explain that the Policy in this case must be construed "according to the entirety of its terms and conditions as set forth in the policy, and as amplified, ex-

tended, or modified by any lawful rider, endorsement, or application attached to and made part of the policy." (Docket 77 at 559) (citing P.R. Laws Ann. tit. 26 § 1125). That is precisely what the magistrate judge did in the R & R. Consulting the entire insurance contract—including the Building and Personal Property Coverage Form, its Covered Causes of Loss–Special Form, and the Equipment Breakdown Endorsement—the magistrate judge correctly determined that the Policy's terms, conditions, and exclusions were clear and unambiguous as a matter of law. *See MAPFRE P.R. v. Guadalupe–Delgado,* 613 F.Supp.2d 213, 217 (D.P.R.2009) (Besosa, J.).

A plain reading of the Policy conflicts with plaintiffs' invitation to read the Policy as providing a $500,000 coverage limit for loss suffered to "property of others" as a result of a mechanical breakdown—but only providing $25,000 in coverage for the exact same type of loss to property of the "named insured." The Building and Personal Property Coverage Form does not extend to losses or damages caused by or resulting from mechanical breakdown, because the Causes of Loss–Special Form expressly excludes coverage for that type of loss. (Docket 46–19 at 2; Docket 53–6 at 2.) That means that the Policy initially did not protect **any** loss that occurred due to a mechanical breakdown—whether the loss was to the property of the named insured or to the property of others. Accordingly, the $500,000 limit for loss to property of others could not have applied to any loss caused by or resulting from a mechanical breakdown.

Precisely because the Causes of Loss–Special Form specifically excluded coverage for equipment breakdown, Economy requested and Triple–S issued the Equipment Breakdown Endorsement. As the magistrate judge correctly reasoned, that Endorsement "provides coverage for equipment breakdown that was otherwise excluded in the Causes of Loss–Special Form," (Docket 77 at 555), and "Economy paid additional premium and 'bought back' coverage for loss or damage as a result of a mechanical breakdown, via the Equipment Breakdown Coverage." *Id.* at 560. The Equipment Breakdown Endorsement specified a covered cause of loss **with its own limits of insurance.** "Although mechanical breakdown is a covered cause of loss under the Policy's Cause of Loss–Special [F]orm, **it is so in accordance with the limits and conditions provided by the Equipment Breakdown Coverage.**" *Id.* at 560–61 (emphasis added). The "spoilage" section of the Equipment Breakdown Endorsement explicitly imposes a $25,000 limit for loss or damage under that coverage and does not distinguish between property of the named insured or of "others." [2] *Id.* Thus, when a mechanical

---

**2.** The "spoilage" section of the Equipment Breakdown Endorsement provides that Triple–S "will pay for **your** loss of 'perishable goods' due to spoilage." (Docket 53–7 at 1.) Plaintiffs argued before the magistrate judge as well as in their objections to the R & R that the inclusion of the word "your" refers only to Economy, and thus "the $25,000 sublimit for spoilage under the Equipment Breakdown Endorsement is only applicable for loss of perishable goods suffered by **the Named Insured.**" (Docket 78 at 4 n. 1.) The Court, like the magistrate judge, is unpersuaded by that

contention and by plaintiffs' reasoning that a $500,000 limit therefore applied.

As discussed above, a plain reading of the Policy shows that the $500,000 limit for losses or damages to property of others does not apply to any loss caused by mechanical breakdown. Triple–S' coverage of losses to "property of others" is not a free-standing, all-risk coverage unencumbered by exclusions. It is unreasonable to interpret Triple–S' Policy as automatically covering all damage to the property of others, no matter what the cause of loss. Instead, the coverage to "property of

breakdown caused any loss, the most Triple–S contractually agreed to pay was $25,000.

Plaintiffs' argument that the magistrate judge "cited the wrong part of the Equipment Breakdown Endorsement in support of the elimination of the 'mechanical breakdown' exclusion" is inconsequential. It was the plaintiffs themselves who advanced the argument that the purchase of the Equipment Breakdown Endorsement—which the Court notes is outlined in Section A(1)—"eliminated" the mechanical breakdown exclusion. (See Docket 47 at 14.) Regardless of the technical mechanics, however, the magistrate judge came to the correct conclusion that the Equipment Breakdown Endorsement "bought back" coverage for loss resulting from a mechanical breakdown. Furthermore, the language in Section (B) of the Equipment Breakdown Endorsement that plaintiffs cite does not support the conclusion that the proper coverage limit for spoilage of property of others due to mechanical breakdown is $500,000. Section (B) expressly modifies the exclusions section from the Causes of Loss–Special Form. (Docket 53–7 at 4.) It does state that "[t]he most we will pay for loss or damage under this endorsement is the applicable Limit of Insurance shown in the Declarations." *Id.* at 5. As mentioned above, however, the $500,000 policy limit for losses to the "property of others" never extended to losses due to a mechanical breakdown. Section (A) of the Equipment Breakdown Endorsement amended the Building and Personal Property Coverage Form to in-

clude additional coverage for spoilage due to an equipment breakdown, and it also includes a corresponding limit of insurance. (*See* Docket 53–7 at 1.) That limit is $25,000. *Id.* Because no other schedule increases that limit, a plain reading of the Policy does not support plaintiffs' contention that "the coverage under the Personal Property of Others and its Limit of $500,000.00 is available for damage caused by an equipment breakdown." (Docket 47 at 15.) To the contrary, the only reasonable interpretation of the Policy is that coverage for loss resulting from spoilage due to a mechanical breakdown—whether to property of the named insured or to others—is $25,000.

In light of the above, Triple–S' motion for summary judgment is **GRANTED.** After reviewing the record, the Court further finds that Triple–S has already paid the $25,000 policy limit. (*See* Docket 53–3 at 5) (testimony of Miriam Rivera, the office insurance adjustor for the coverage in question, indicating that Triple–S paid $25,000 for the loss of the food to Economy, and the insured accepted and cashed the check); (Docket 57 at 6) (plaintiffs' admission that Triple–S reimbursed Economy $32,205.09). All claims against defendant Triple–S, therefore, must be **DISMISSED WITH PREJUDICE.**

**B. Dismissal of Plaintiff Lloyd's**

■ Plaintiffs' second objection pertains to the magistrate judge's recommendation that the Court grant Triple–S' request to dismiss Lloyd's cause of action. They claim that Lloyd's, as a party in interest,

others" is subject to the Cause of Loss–Special Form. Because the Equipment Breakdown Endorsement modifies that form and provides a $25,000 limit, the property of others coverage for spoilage resulting from mechanical breakdown is subject to that $25,000 limit. The Court is in agreement with the magistrate judge that it need not "read the

Policy as if it was tailored to meet AJC's specific needs and requirements." (Docket 77 at 561.) It interprets the Equipment Breakdown Endorsement broadly, however, to include not just Economy's loss of perishable goods due to spoilage from mechanical breakdowns, but also that type of loss to the property of others.

has standing pursuant to article III to sue defendants even though it has yet to indemnify or reimburse AJC. (Docket 78 at 16–17.) Because the Policy between Lloyd's and AJC has a deductible of $400,000, plaintiffs argue that Lloyd's will suffer harm in the near future depending on AJC's recovery from defendants in this case. *Id.* Their arguments merely rehash, however, the exact positions taken in their original submission to the magistrate judge. (*See* Docket 56 at 11–13.) The Court declines to allow plaintiffs the opportunity to take a "second bite at the apple" through their objections to the R & R, and finds no clear error on the part of the magistrate judge. The law is clear that an insurer is a real party in interest sufficient for article III standing "only when direct actions are maintained against them or when they become subrogated to the rights of their insureds *after* payment of the loss." *Compton v. D'Amore*, 101 A.D.2d 800, 475 N.Y.S.2d 463 (1984) (internal punctuation and citations omitted) (emphasis added); *see also Armour Pharm. Co. v. Home Ins. Co.*, 60 F.R.D. 592 (N.D.Ill.1973) ("In the instant case, there has been no actual subrogation or loan receipt. No payment has been made . . . . [M]erely because one may benefit by the result in litigation does not make him 'a real party in interest.' "). Because Lloyd's has not paid AJC under Policy Number MC10ACXU, it has no right to subrogate and is not a real party in interest to this lawsuit. Plaintiff Lloyd's causes of action are therefore **DISMISSED WITHOUT PREJUDICE.**

## III. CONCLUSION

For the reasons discussed above, the Court **ADOPTS IN FULL** the magistrate judge's findings contained in the R & R. Accordingly, the Court **GRANTS** Triple–S' motion for summary judgment, (Docket 52). All claims against defendant Triple–

S, therefore, are **DISMISSED WITH PREJUDICE.** Plaintiffs' motion for summary judgment, (Docket 45), is **DENIED.** All causes of action brought by plaintiff Lloyd's are **DISMISSED WITHOUT PREJUDICE.**

**IT IS SO ORDERED.**

## REPORT AND RECOMMENDATION

CAMILLE L. VELEZ–RIVE, United States Magistrate Judge.

## INTRODUCTION

**A. Plaintiffs' Motion for Summary Judgment.**

Plaintiffs AJC Logistics, LLC, AJC International Inc. (hereinafter referred to jointly as "AJC"), and Underwriters at Lloyd's of London ("Lloyd's" and with AJC, "Plaintiffs") filed a motion for summary judgment. Plaintiffs request judgment be entered in their favor against co-defendant Triple–S Propiedad ("Triple–S") for Insurance Policy No. CP–081038479–0/000 (the "Policy") issued to co-defendant Economy International Services, Inc. ("Economy") provides coverage limit of $500,000.00 for loss of property owned to Plaintiffs as a result of the equipment breakdown at Economy's cold storage facility. (Docket Nos. 45–47). Plaintiffs filed the Amended Complaint to recover the loss sustained as a result of a mechanical breakdown while various shipments of AJC's frozen seafood, chicken, and beef were stored at Economy's cold storage facility, being exposed to temperature abuse for extended periods and making them unfit for human consumption. (Docket No. 5). Co–Plaintiff Lloyd's, in turn, was joined as a party with interest as it issued an insurance policy on behalf of AJC on the goods/commodities in question

and, therefore, is potentially liable for the loss suffered by AJC. *Id.* at ¶¶ 14, 55–58.[1]

Co-defendant Triple–S filed its opposition to above summary judgment motion alleging the insurance policy issued to Economy does not provide coverage limit as requested of $500,000.00 for spoilage loss. Rather, Triple–S avers, its limit is $25,000.00 under a policy endorsement and such payment was already issued and accepted by codefendant Economy. (Docket Nos. 54 and 55). Plaintiffs filed the corresponding reply (Docket Nos. 62 and 63), to which Triple–S opposed. (Docket No. 67). These issues are closely intertwined with Triple S' own motion for summary judgment as to the policy and limits of insurance for the loss suffered by AJC. (Docket No. 52–53).[2]

## B. Defendant Triple–S' Motion for Summary Judgment.

Triple–S filed its own motion for summary judgment claiming that the Policy for Economy has a limited coverage of $25,000.00 for spoilage claims under its Equipment Breakdown Endorsement and it had already paid said limit without further obligation due to Plaintiffs. Triple–S submits its commercial policies for Economy exclude coverage damages resulting from equipment breakdown and for damages as a result of changes in temperature. Therefore, Economy purchased a separate Equipment Breakdown Endorsement to cover its refrigeration equipment, which provides coverage for loss of perishable good to spoilage caused by an accident to covered equipment. Said endorsement specifically limits coverage to $25,000.00, which Triple–S already paid. Economy had also purchased a separate and additional coverage for spoilage and was issued a Spoilage Coverage Endorsement with a limit of $50,000.00 and $50,000.00 in excess. However, the Spoilage Coverage Endorsement purchased by Economy applied only to losses due to power outage for Economy chose not to purchase a separate Spoilage Coverage Endorsement for losses due to "Breakdown or Contamination." (Docket Nos. 52 and 53).

Triple–S also requests that co-plaintiff Lloyd's allegations be dismissed as Lloyd has not paid to its insured or to third parties and, thus, it has no valid cause of action of subrogation upon its lack of payment. (Docket No. 52, section G, pp. 3 and 22–23).

On June 17, 2013, Plaintiffs filed their Opposition to Triple S' motion for summary judgment with a statement of contested facts. (Docket Nos. 56 and 57). As with AJC's motion for summary judgment, the parties filed their corresponding replies and sur-replies. (Docket Nos. 66 and 70).

For the reasons stated below, and upon careful consideration of the parties' submissions (including eight (8) motions and over fifty (50) exhibits), and applicable law, it is recommended that Triple–S' Motion for Summary Judgment be **GRANTED** and Plaintiffs' Motion for Summary Judgment be **DENIED.**

---

1. Economy is presently in default. (Docket No. 29). Economy's default, however, does not mean it admits to the legal conclusions made in the complaint inasmuch as legal conclusions are not deemed admitted as a result of the entry of default. *See e.g.,* 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure § 2688, at 63 (3d ed.1998).

2. Having these matters been referred for report and recommendation, separate pleadings on summary judgment issues were requested to facilitate the presiding Court's review. (Docket No. 51).

## RELEVANT FINDINGS OF FACT

Plaintiffs' request for summary judgment and co-defendant's opposition and counter motion do not contest the loss claimed in the Amended Complaint of frozen food commodities that were owned by AJC and which had been deposited in Economy's walk-in freezer warehouse facilities to be thereafter delivered to various AJC customers through Puerto Rico. (Docket No. 46, Plaintiff's Statement of Uncontested Material Facts ("PSUMF") ¶ 9 and Docket No. 55, Triple–S Counter Statement of Uncontested Material Facts "DCSUMF" ¶ 9).[3]

At times relevant, co-defendant Economy was engaged in the business of storing perishable goods, specially frozen items in its walk-in freezers located at its warehouse facilities in Guaynabo's Industrial Park. PSUMF ¶ 5 and DCSUMF ¶ 5.

Co-defendant, Manuel Espinosa Casanova, is the President and Secretary of Economy International Services, Inc. PSUMF ¶ 6 and DCSUMF ¶ 6.

On or before August 26, 2010, the goods/commodities in question were transported to Economy's cold storage facility until the goods/commodities were to be delivered to various AJC customers throughout Puerto Rico. PSUMF ¶ 9 and DCSUMF ¶ 9. The goods/commodities in question are comprised of various frozen items of seafood, chicken, and beef, including grouper, sea food mix, snapper fillers, snapper steak, mahi mahi portions, kingfish, shrimp, salmon, surimi, basa fish, chicken patties, chicken wings, chicken drums and thighs, white check cubes, chicken shish cabob, and beef patties. PSUMF ¶ 3 and DCSUMF ¶ 3.

On September 19, 2010, AJC received notice from Economy informing that its freezers holding the goods/commodities had malfunctioned dating back to August 26, 30 and September 30, 2010. PSUMF ¶ 13 and 15; DCSUMF ¶ 13 and 15. Thereafter, AJC received a tally of damaged product identified by Economy.

Thereafter, the United States Department of Agriculture deemed the beef and chicken food product were unfit for human consumption and ordered their destruction. PSUMF ¶ 16; DCSUMF ¶ 16. The seafood was exposed to the same conditions as the beef and chicken products and was destroyed. PSUMF ¶ 18 and DCSUMF ¶ 18.

### A. THE POLICY

It is also uncontested that Economy had been issued Insurance Policy No. CP–081038479–0/000 [4] by co-defendant Triple–S from the period of August 7, 2010 through August 7, 2011. The name of the insured under Triple–S' Insurance Policy is Manuel Espinosa DBA Economy International Services in Mario Juliá Industrial Park, A Street Lote 12, San Juan, PR 00918. PSUMF ¶¶ 24–25 and DCSUMF ¶¶ 24–25. Plaintiffs are not listed as insureds or additional insureds under the Policy. *Id.* As to the insurance coverage, the Policy states the insurance at the described premises applies only for coverage

---

**3.** Paragraphs 1 to 23 of PSUMF relate to the purchase, receipt, handling and mechanical breakdown that resulted in the loss of frozen items of plaintiffs under the custody and control of Economy. (Docket No. 46, PSUMF ¶¶ 1–23). As to these statements, co-defendant Triple–S' opposition is limited to the proper name of the rightful title-holder of the goods/commodities, whether AJC International, Inc. or AJC Logistics, LLC. Furthermore, co-defendant Triple–S has admitted to paragraphs 2–3, 5–6, 10–13, 16, 19–23. The statements opposed at 1, 4, 7–8, and 17 are not relevant to the Insurance Policy limits at issue. (Docket No. 55, DCSUMF ¶¶ 1–23).

**4.** Renewal of 30–CP8–001037942–0.

for which a limit of insurance is shown and such is subject to all of its terms, conditions, exclusions and limitations—which is an issue of law and not a disputed fact. PSUMF ¶ 26 and DCSUMF ¶ 26.

It is also uncontested that AJC maintained in place insurance on the commodities in question with co-plaintiff Lloyd's, under Policy Number MC10ACXU. PSUMF ¶ 51; DCSUMF ¶ 51; see also, Plaintiffs' Opposition to Triple–S' Uncontested Material Facts "AJC's CSUMF" ¶ 7. Economy International is a named insured under the Policy issued by Lloyd's. See, Triple–S' Statement of Uncontested Material Facts in Support of its Motion for Summary Judgment ("Triple–SUMF") ¶ 46 and AJC's CSUMF ¶ 46.

The Policy at issue consists of the following coverage parts: (i) Commercial Property Coverage; (ii) Commercial General Liability Coverage; and (iii) Commercial Inland Marine Coverage. Triple–S UMF ¶ 22 and AJC's CSUMF ¶ 22.[5]

The Commercial Inland Marine Coverage covers specialized equipment scheduled or described in the Policy. Plaintiffs' property is not scheduled or described in the Commercial Inland Marine. Form of the policy and, accordingly, not covered by the Commercial Inland Marine Coverage. Triple–S UMF ¶ 23 and AJC's CSUMF ¶ 23.

The Commercial General Liability Coverage Form contained in the Policy excludes from coverage "Property Damage" to: "Personal property in the care, custody or control of the insured" Triple–S UMF ¶ 24 and AJC's CSUMF ¶ 24; see also Section 2j(4) of the Commercial General Liability Coverage Form, Docket No. 53, Exhibit 14.

The Commercial Property Coverage, contains a Building and Personal Property Coverage Form. Section A of the Building and Personal Property Form provides coverage "for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss." Triple–S UMF ¶ 25 and AJC's CSUMF ¶ 25; see also Section A of the Building an Personal Property Coverage Form, Docket No. 46, Exhibit 19.

Section A.3 of the Building and Personal Property Coverage Form, Covered Causes of Loss, states "[s]ee applicable Causes of Loss Form as shown in the Declarations." The Declarations, in turn, contain another section called Causes of Loss—Special Form. The Causes of Loss—Special Form states the specific causes of loss covered and excluded under the Policy. Triple–S UMF ¶ 25 and AJC's CSUMF ¶ 25; see also Docket No. 53, Exhibit 6.

The Causes of Loss–Special Form provides, in its pertinent part, as follows:

**A. COVERED CAUSES OF LOSS**

When Special is shown in the Declarations, Covered Causes of Loss means RISKS OF DIRECT PHYSICAL LOSS unless the loss is:

1. Excluded in Section B., Exclusions; or

2. Limited in Section C., Limitations; that follow.

**B. EXCLUSIONS**

1. We will not pay for loss or damage caused directly or indirectly by any of the following. Such loss or damage is excluded regardless of any other cause or event that contributes

---

**5.** A complete copy of the Policy was filed by Triple–S as Exhibit 5 of Docket No. 55. However, to facilitate the presiding Court's review, the undersigned refers to the Exhibit number under which the relevant Policy, Declarations, Coverage Forms and Special Forms were individually submitted by the parties.

concurrently or in any sequence to the loss.

. . . .

2. We will not pay for loss or damage caused by or resulting from any of the following:

. . . .

    d.(1) . . .

    (2) . . .

    (3) . . .

    (4) . . .

    (5) . . .

    (6) Mechanical breakdown, including rupture or bursting caused by centrifugal force. However, this does not apply to any resulting loss or damage caused by elevator collision.;

    (7) The following causes of loss to personal property:

    (a) Dampness or dryness of atmosphere;

    (b) Changes in or extremes of temperature; or

    (c) Marring or scratching.

*See,* Docket No. 53, Exhibit 6.

Because the Causes of Loss–Special Form specifically excludes coverage for equipment breakdown, the insured requested and Triple–S issued the "Equipment Breakdown" Endorsement. Triple–S UMF ¶ 29 and AJC's CSUMF ¶ 29. The Equipment Breakdown Endorsement provides coverage for equipment breakdown that was otherwise excluded in the Causes of Loss–Special Form. Triple–S UMF ¶ 30 and AJC's CSUMF ¶ 30. In AJC's words, the Equipment Breakdown Endorsement eliminates the mechanical breakdown exclusion in the Causes of Loss–Special Form. AJC's CSUMF ¶ 30.

The Equipment Breakdown Endorsement provides, in its pertinent part, as follows:

A. The Building and Personal Property Coverage Form is modified as follows: Additional Coverages

The following is added to 4. Additional Coverages:

**Equipment Breakdown**

(1) We will pay for loss caused by or resulting from an "accident" to "covered equipment." As used in this Additional Coverage, an "accident" means direct physical loss as follows:

    (a) mechanical breakdown, including rupture or bursting caused by centrifugal force;

. . . .

(2) Unless otherwise shown in a Schedule, the following coverages also apply to loss caused by or resulting from an "accident" to "covered equipment". These coverages do not provide additional amounts of insurance.

    (a) . . .

    (b) . . .

    (c) Spoilage

    (i) We will pay for your loss of "perishable goods" due to spoilage.

    (ii) We will also pay for your loss of "perishable goods" due to contamination from the release of refrigerant, including but not limited to ammonia.

    (iii) We will also pay any necessary expenses you incur to reduce the amount of loss under this coverage. We will pay for such expenses to the extent that they are not exceed the amount of loss that otherwise would have been payable under this coverage.

    (iv) if you are unable to replace the "perishable goods" before its anticipated sale, the amount of our payment will be determined on the basis of the

sales price of the "perishable goods" at the time of the "accident," less discounts and expenses you otherwise would have had. Otherwise, our payment will be determined in accordance with the Valuation condition.

The most we will pay for loss of damage under this coverage is $25,000.00 unless otherwise shown in a Schedule.

Docket No. 53, Exhibit 7.

In addition to the Equipment Breakdown Endorsement, Economy purchased a separate coverage contained on an endorsement called "Spoilage Coverage." See, Docket No. 53, Exhibit Nos. 5 and 9. This endorsement "modifie[d] insurance provided under the Building and Personal Property Coverage Form." *Id.* The Spoilage Coverage states it was "extended to insure against direct physical loss or damage by the Covered Causes of Loss, but only with respect to coverage provided by this endorsement." The Spoilage Endorsement includes " 'perishable stock' at the premisses owned by you or by others that is in your care, custody or control." *Id.* It further replaces Paragraph A.3. COVERED CAUSES OF LOSS (contained in the Causes of Loss–Special form) so that the insured includes as a covered clause of loss "change in temperature or humidity resulting from mechanical breakdown or failure of refrigerating" and/or "Power Outage, meaning change in temp-

erature or humidity ..." Docket No. 53, Exhibit 9, p. 2. It also allowed the insured to include as a COVERED CAUSES OF LOSS "change in temperature or humidity resulting from mechanical breakdown." *Id.*[6] However, as it appears from the "Commercial Property Declaration," AJC only obtained the endorsement for "Power Outage". *Id.*

The parties agreed that since in this case the loss to frozen food commodities owned by AJC was not caused by a power outage, the coverage provided by the Spoilage Coverage Endorsement does not apply. Triple–S UMF ¶ 37 and AJC's CSUMF ¶ 37.[7] In fact, AJC even considers the mention of the "Power Outage" coverage or the "change in temperature" exclusion to be "irrelevant to this case." (Docket No, 62, p. 2, ¶ 3)

None of the Plaintiffs are listed as insureds or additional insureds under the Policy. *See,* Docket No. 53, Exhibit 5.

AJC has not received any payment from Lloyd's for the loss alleged in the Amended Complaint. Triple–S UMF ¶ 47 and AJC's CSUMF ¶ 47.[8]

AJC has not received any payment from Lloyd's for reimbursement of expenses related to the loss of foodstuff. Triple–S UMF ¶ 48 and AJC's CSUMF ¶ 48.[9]

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to in-

---

**6.** In other words, the Spoilage Endorsement allows the insured to include as a Covered Cause of Loss in the Causes of Loss–Special Form "change in temperature" as a result "from mechanical breakdown" or "change in temperature" due to "power outage." Plaintiffs denied the scope and purpose of the Spoilage Endorsement. AJC's CSUMF ¶ 35. As previously indicated, however, the interpretation of terms, conditions, exclusions and limitations of the Policy is an issue of law and not a disputed fact.

**7.** AJC's qualification of Triple–S UMF ¶ 37 including its own legal interpretation of the Policy does not change the uncontested fact that the loss in this case was not caused by a power outage.

**8.** Again, AJC's qualification of statement number 47 does not contest this fact.

**9.** AJC's qualification of statement number 48 does not contest this fact.

terrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). Pursuant to the language of the rule, the moving party bears the two-fold burden of showing that there is "no genuine issue as to any material facts," and that he is "entitled to judgment as a matter of law." *Vega–Rodríguez v. Puerto Rico Tel. Co.,* 110 F.3d 174, 178 (1st Cir.1997).

After the moving party has satisfied this burden, the onus shifts to the resisting party to show that there still exists "a trial worthy issue as to some material fact." *Cortés–Irizarry v. Corporación Insular,* 111 F.3d 184, 187 (1st Cir.1997). A fact is deemed "material" if it potentially could affect the outcome of the suit. *Id.* Moreover, there will only be a "genuine" or "trial worthy" issue as to such a "material fact," "if a reasonable fact-finder, examining the evidence and drawing all reasonable inferences helpful to the party resisting summary judgment, could resolve the dispute in that party's favor." *Id.*

At all times during the consideration of a motion for summary judgment, the Court must examine the entire record "in the light most flattering to the non-movant and indulge all reasonable inferences in the party's favor." *Maldonado–Denis v. Castillo–Rodríguez,* 23 F.3d 576, 581 (1st Cir.1994). There is "no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, [and] no room for the judge to superimpose his own ideas of probability and likelihood...." *Greenburg v. Puerto Rico Mar. Shipping Auth.,* 835 F.2d 932, 936 (1st Cir.1987). In fact, "[o]nly if the record, viewed in [this] manner and without regard to credibility determinations, reveals no genuine issue as

to any material fact may the court enter summary judgment." *Cadle Co. v. Hayes,* 116 F.3d 957, 960 (1st Cir.1997).

"Cross-motions for summary judgment do not alter the summary judgment standard, but instead simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." *Wells Real Estate Inv. Trust II, Inc. v. Chardon/Hato Rey P'ship, S.E.,* 615 F.3d 45, 51 (1st Cir.2010) (*citing Adria Int'l Group, Inc. v. Ferré Development, Inc.,* 241 F.3d 103, 107 (1st Cir.2001)) (internal quotation marks omitted). Although each motion for summary judgment must be decided on its own merits, each motion need not be considered in a vacuum. *Wells Real Estate Inv. Trust II, Inc.,* 615 F.3d at 51 (*quoting P.R. American Ins. Co. v. Rivera–Vázquez,* 603 F.3d 125, 133 (1st Cir.2010)) (internal quotation marks omitted). "Where, as here, cross-motions for summary judgment are filed simultaneously, or nearly so, the district court ordinarily should consider the two motions at the same time, applying the same standards to each motion." *Wells Real Estate Inv. Trust II, Inc.,* 615 F.3d at 51 (*quoting P.R. Am. Ins. Co. v. Rivera–Vázquez,* 603 F.3d at 133) (internal quotation marks omitted).

## LEGAL DISCUSSION

### A. Insurance Contract Interpretation Generally.

The parties agree that Puerto Rico law governs the construction of Triple–S' insurance policy in this case.

The Puerto Rico Insurance Code (the "Code") governs insurance contracts in Puerto Rico. The terms of the insurance contract are contained in the policy. *Natal Cruz v. Negrón,* 2013 TSPR 67, *5 (*citing Maderas Tratadas v. Sun Alliance*

*et al.,* 185 D.P.R. 880 (2012)). The Policy is a written instrument in which a contract of insurance is set forth, and it is the law between the parties. P.R. Laws Ann. tit. 26 § 1114(1).

Under the Code, the court must construe an insurance contract "according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made part of the policy." P.R. Laws Ann. tit. 26 § 1125; *see also, Natal Cruz v. Negrón,* 2013 TSPR 67, *5–6; *Marina Aguila v. Den Caribbean, Inc.,* 490 F.Supp.2d 244, 248 (D.P.R.2007) (*citing PFZ Props., Inc. v. Gen. Accident Ins. Co.,* 136 D.P.R. 881, 902 (1994) and *Metlife Capital Corp. v. Westchester Fire Ins. Co.,* 224 F.Supp.2d 374, 382 (D.P.R.2002)). When interpreting contracts, the court must read contract provisions in relation to one another, giving unclear provisions the meaning which arises from considering all provisions together. P.R. Laws Ann. tit. 31, § 3475. By doing so, the court should assign terms their common meanings, and any term having multiple meanings should be read in the sense that is most suitable to give it effect. P.R. Laws Ann. tit. 31, § 3474.

When the Code does not provide an interpretative approach applicable to a particular situation, the court looks to the Puerto Rico Civil Code as a supplemental source of insurance contract interpretation law. *See Natal Cruz,* 2013 TSPR 67, n. 12 and *Marina Aguila,* 490 F.Supp.2d at 249 (*citing Casanova v. P.R.-Am. Ins. Co.,* 6 P.R. Offic. Trans. 960, 106 D.P.R. 689 (1978) and *González v. John Hancock Mut. Life Ins. Co.,* 927 F.2d 659, 660 (1st Cir. 1991)). In this regard, Article 1233 of the Puerto Rico Civil Code provides that, "if the terms of a contract are clear and leave no doubt as to the intentions of the con-tracting parties, the literal sense of its stipulations should be observed." P.R. Laws Ann. tit. 31 § 3471.

▮ Under Puerto Rico law, insurance contracts are considered contracts of adhesion that must be liberally interpreted in favor of the insured. *Marina Aguila,* 490 F.Supp.2d at 248 (*citing Quiñones López v. Manzano Pozas,* 141 D.P.R. 139, 155 (1996); *Metlife Capital,* 224 F.Supp.2d at 383); *see also, MAPFRE Puerto Rico v. Guadalupe–Delgado,* 613 F.Supp.2d 213, 217 (D.P.R.2009)(Besosa, J.)(*citing Guerrido García v. U.C.B.,* 143 D.P.R. 337, 348 (1997) and *Nahan v. Pan Am. Grain Mfg. Co, Inc.,* 62 F.Supp.2d 419 at n. 5 (D.P.R. 1999). In *Natal Cruz,* the Puerto Rico Supreme Court recently reiterated that exclusionary language (setting forth circumstances in which the insurance policy does not provide coverage) should be interpreted restrictively in order to comply with the policy's intent of providing coverage to the insured. *Natal Cruz,* 2013 TSPR 67, *5; *see also Marina Aguila,* 490 F.Supp.2d at 248–249 (internal citations omitted). The court further reiterated this general rule does not require courts to interpret a clear and unambiguous clause that favors the insurer in a manner that benefits the insured. *Natal Cruz,* 2013 TSPR 67, *5 and *MAPFRE Puerto Rico,* 613 F.Supp.2d at 217 (quoting *Metlife Capital,* 224 F.Supp.2d at 382). Therefore, when the terms, conditions, and exclusions included in an insurance policy are clear and unambiguous, the court must interpret and enforce the policy in accordance with the will of the parties. *Marina Aguila,* 490 F.Supp.2d at 249 and *Natal Cruz,* 2013 TSPR 67 at *5. (Internal citation omitted). In the absence of ambiguity, the contract terms bind the parties. *Id.*

▮ The court determines, as a matter of law, whether an insurance policy's terms, conditions, and exclusions are clear

and unambiguous. *See MAPFRE Puerto Rico,* 613 F.Supp.2d at 217 (*quoting* Couch on Insurance 3d Ed. § 21:13 (noting that "[w]hether or not a contract of insurance is ambiguous is a question of law for the court, in keeping with the general rule that the construction and effect of a written contract of insurance is a matter of law, to be determined by the court and not by the jury, where there is no occasion to resort to extrinsic evidence for the purpose of resolving ambiguity.").

■ As explained in *MAPFRE Puerto Rico,* the First Circuit Court of Appeals has clarified that, "while ambiguous terms may be constructed to favor an insured, we may not find a term ambiguous merely because it eliminated coverage." 613 F.Supp.2d at 217 (*citing Littlefield v. Acadia Ins. Co.,* 392 F.3d 1, 8 (1st Cir.2004)). In other words, "[c]lear provisions should not be strained to suggest ambiguity." *Id.* (*citing Andover Newton Theological School, Inc. v. Continental Casualty Co.,* 930 F.2d 89, 93 (1st Cir.1991)); *see also* Couch on Insurance 3d Ed. § 22:10 (noting that "if there is no ambiguity in the insurance contract it is the duty of the court to apply to the words used their ordinary meaning and not favor either party in the construction.").

Similarly, this Court held in *Metlife Capital Corp.,* 224 F.Supp.2d at 382, that under Puerto Rico law, when the terms, conditions, and exclusions listed in a policy are clear and give no margin for ambiguities or differences in interpretation, they must be enforced in accordance with the will of the parties.

■ As reiterated by the Puerto Rico Supreme Court in *Natal Cruz,* the same is true with respect to the exclusions contained within an insurance policy, that serve to limit the general coverage agreement. *Natal Cruz,* 2013 TSPR 67, *5 (internal citations omitted). Thus, if clear and unambiguous, the exclusion shall be interpreted in accordance with its function within the policy. Similarly, if an exclusion clause is clear and unambiguous, then it does not afford coverage despite whatever inferences may arise from the other clauses of the contract. *Id.* at n. 13.

**B. Policy Number CP–081038479–0/000.**

In this case, a thorough reading of the complete Policy confirms that its terms are clear and unambiguous. This includes the language of the Building and Personal Property Coverage Form (with its Covered Causes of Loss and Exclusions sections as detailed in the Causes of Loss–Special Form). Thus, there is no need to apply the anti-insurer rule or to consider extrinsic evidence. *See* Couch on Insurance § 22:17 (West 3rd ed.2005) (noting that "Courts must first interpret the policy language; there is no need to apply the anti-insurer rule when the policy language is clear.").

Accordingly, and as mandated by the Puerto Rico Insurance Code, this court must construe the Policy "according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made part of the policy." P.R. Laws Ann. tit. 11 § 1125. While doing that, the Policy provisions must be enforced as written and the literal language of the policy be observed. *See* P.R. Laws Ann. tit. 31 § 3471. *See also* Couch at § 21:4 (noting that "where the policy language is clear and unambiguous the court must enforce it as it is written and cannot impose a strained construction in order to reach a different result than that demanded by the policy provisions.").

Plaintiffs AJC invites this court in its motion for summary judgment to read the

Policy as providing coverage limit of $500,000.00 for the damage caused to its goods/commodities, as section A.1.c. of the Building and Personal Property Coverage Form provides said coverage limit for damage caused to "personal property of others" under the case, custody or control of Economy, while the same is located in Economy's facilities.[10] AJC further argues, that since the Policy expressly excludes loss or damage as a result of a mechanical breakdown, Economy paid additional premium and "bought back" coverage for loss or damage as a result of a mechanical breakdown, via the Equipment Breakdown Coverage; thus, making an equipment breakdown a covered cause of loss under the Policy's Cause of Loss–Special Form. Plaintiffs further argue that, since the Equipment Breakdown Coverage (purchased as an additional coverage by Economy) provides that Triple–S "will pay for loss caused by or resulting from an 'accident' to 'covered equipment,'" and "accident" is defined by the Equipment Breakdown Coverage to include "mechanical breakdown," the Policy covers the loss to "personal property of others" caused by a "mechanical breakdown".[11]

AJC's argument, however, fails to consider the *full* language of the Equipment Breakdown Coverage and the sub-limit established therein for its loss. Further-

more, to concede to AJC's argument this court would need to stop reading the Equipment Breakdown Coverage at Section A(1) and ignore the clear and unambiguous restrictions, conditions and limitations that follow. More specifically, and although mechanical breakdown is a covered cause of loss under the Policy's Cause of Loss–Special form, it is so in accordance with the limits and conditions provided by the Equipment Breakdown Coverage. In this case, Section A(2)(c)(I) clearly limits AJC's loss for perishable goods that were damaged or destroyed due to spoilage to $25,000.00. *See also* Section A(5)(g) (defining "perishable goods" as personal property maintained under controlled conditions for its preservation, and susceptible to loss or damage if the controlled conditions change). There is no other reasonable interpretation of the Policy and the corresponding endorsement.

In its Reply to Triple–S' Opposition to Plaintiffs' Motion for Summary Judgment (Docket No. 62) and again in its Opposition to Triple–S' Motion for Summary Judgment (Docket No. 56, pp. 8–9), AJC suggests—for the first time—a new reading of Section A(2)(c)(I) to support its contention that the Policy provides a $500,000.00 limit of insurance for the loss suffered. It now contends that, since the last part of Section A(2)(c)(I) provides that

---

**10.** Section A.1.c specifically provides that Triple–S "payment for loss of or damage to personal property of others will only be for the account of the owner of the property."

**11.** The Court has also reviewed the cases cited by Plaintiffs in support of their contention regarding the applicable coverage limits, to wit: *General Star Indem. Co v. Custom Editions Upholstery Corp.*, 940 F.Supp. 645, 653–656 (S.D.N.Y.1996) and *Green Meadow Bean Co.v. Nationwide Agribusiness Ins. Co.*, 2010 WL 1427271 (D.Minn. Apr. 8, 2010). Both cases are unpersuasive for many reasons. For example, in *Green Meadow Bean Co.* the Court analyzed the Policy under Minnesota

law under which the court may also consider the "reasonable expectations of the insured", regardless of whether the policy language is ambiguous. In fact, in this case the court considered extrinsic evidence to further support its conclusion. That is not what P.R. law mandates in this case to interpret the Policy. Moreover, it is clear from the Court's opinion that the Policy in said case did not have the clear coverage limit that was expressly included in the Equipment Breakdown Coverage here at issue. As such, *Green Meadow Bean Co.* is inapposite. The same is true with the *General Star Indem. Co.* case.

the $25,000.00 coverage limit is applicable "unless otherwise shown in a Schedule," the "unless otherwise shown in a Schedule" refers to the limits of $500,000.00 contained in the Declarations of the Policy.[12] This new reading is not only disingenuous, but contrary to Puerto Rico insurance and contract law under which "[i]f an exclusion clause is clear and unambiguous and applicable, then it does not afford coverage despite whatever inferences may arise from the other clauses in the contract. Each exclusion clause should be read independently from the others and according to its functions in the policy's general agreement." *See Nahan,* 62 F.Supp.2d at 423–24 (*quoting* from the Puerto Rico Supreme Court's case *Melendez Piñero v. Levitt Sons,* 129 D.P.R. 521 (1991)). The same is true with respect to the clear coverage limits of the Policy. Here, the Endorsement Breakdown Coverage is very clear and unambiguous in limiting the corresponding coverage for spoilage due to equipment breakdown to $25,000.00 and no other Schedule provides a higher coverage limit for AJC's loss. Although there is a separate coverage in the Spoilage Coverage Endorsement, it is uncontested that the same does not apply to this case. Triple–S UMF ¶ 37 and AJC's CSUMF ¶ 37.

Moreover, what Plaintiffs propose is that the Schedule that "shows otherwise" under the "unless otherwise shown *in a Schedule*" reference in Section A.(2)(c) of the Equipment Breakdown, is the last sentence of the *same* Equipment Breakdown Coverage that unequivocally and explicitly limits coverage to $25,000.00 for loss of perishable good due to spoilage caused by an accident to covered equipment. (Docket No. 56, pp. 7–11). Again, said reading will require this Court to ignore the clear and unambiguous limitations under the Equipment Breakdown Coverage and the rules of hermeneutics contemplated in Puerto Rico insurance and contract law that were previously discussed.[13]

Although Plaintiffs have a direct action against Triple–S as Economy's and Espinosa's insurer under Puerto Rico law, *see* P.R. Laws Ann. tit 26 § 2003, it does not mean this Court must read the Policy as if it was tailored to meet AJC's specific needs and requirements.

Accordingly, it is recommended that Plaintiffs' Motion for Summary Judgment (Docket No. 45) be **DENIED.** For the same reasons, and since this court's recommendation is consistent with the arguments raised by Triple–S in sections D, E

12. In support if this new reading, Plaintiffs invite this Court to consider extrinsic evidence, including, among others, the testimony of Mr. Richard Wilson, a staff adjuster of the Hartford Steam Boiler Inspection and Insurance Co. The Court, however, reminds Plaintiffs that Puerto Rico's insurance and contract law previously discussed prohibit extrinsic evidence to interpret or alter the contents of a clear and unambiguous insurance contract.

13. Plaintiffs also insist the Policy is an "ALL RISK" Policy, giving a significant weight to the general description of the policy included in the Renewal Declaration (Docket No. 53, Exhibit 5) stating that "Prem. No. 1 Bldg. No. 1 Mario Juliá Industrial Park Lote 12 Calle A Guaynabo PR on contents proper of a cold

storage while in a one story concrete building." (Docket No. 47, p. 13) (Emphasis added). This is nothing but disingenuous. As mandated by the Puerto Rico Insurance Code, this court must construe the Policy "according to the entirety of its terms and conditions as set forth in the policy, and as amplified, extended, or modified by any lawful rider, endorsement, or application attached to and made part of the policy." P.R. Laws Ann. tit. 11 § 1125. (Emphasis added). In any event, as with the caption or title of an endorsement, this sentence cannot override the Policy provisions if the Policy's provisions unambiguously show the intent of the parties. *See e.g. Kemper Nat. Ins. Companies v. Heaven Hill Distilleries, Inc.,* 82 S.W.3d 869 (Ky.2002).

and F of its Motion for Summary Judgment regarding the coverage limit set forth in the Policy, it is recommended that Triple–S' request for summary judgment regarding the coverage limit be **GRANTED.**[14]

## C. Triple–S' Request to Dismiss Lloyd's Claims.

In section G of its Motion for Summary Judgment, Triple–S requests that Lloyd's cause of action be dismissed as it is uncontested that Lloyd's has not made a payment to AJC for its loss and, therefore, it cannot subrogate the rights of AJC without paying to its insured for the loss sustained. (Docket No. 52, pp. 22–23). It further alleges, "the subrogation of an indemnity insurer arises by operation of law when it makes payment to the insured, that is, the payment of an obligation by a surety ordinarily entitles him to subrogation of all the rights, remedies and equities of the oblige." *Id.* at p. 23 (*citing Aseg. Lloyd's London v. Compañía de Desarrollo Comercial de P.R. et al.*, 126 D.P.R. 251 (1990)(internal citations omitted)).

Plaintiffs, in turn, maintain that even though Lloyd's has yet to indemnify or reimburse AJC under the Lloyd's Policy, it was joined as a party with real an direct interest to claim subrogation for the amount paid, or to be paid, to AJC under Fed. R. Civ. Pro. 20(a). (Docket No. 56, pp. 11–13). They further allege that AJC maintained in place and insurance on the goods/commodities in question, via its broker, to Lloyd's and that AJC's claim has been accepted and is under evaluation by Lloyd's as to the actual amount of loss.

Therefore, it can be joined in this action. The Court does not agree.

Insurers are deemed to be real parties in interest "only when direct actions are maintained against them or when they become subrogated to the rights of their insureds after payment of the loss." *Compton v. D'Amore, et al.*, 101 A.D.2d 800, 475 N.Y.S.2d 463, 466 (1984)(internal citations omitted)(emphasis added); *see also* Couch on Insurance 3d Ed. § 222:5 and § 222:20; *Lumbermen's Mut. Cas.Co. v. Elbert*, 348 U.S. 48, 75 S.Ct. 151, 99 L.Ed. 59 (1954) and *United States v. Aetna Cas. & Sur. Co.*, 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949); and P.R. Laws Ann. tit. 31 § 3250.

Thus, it is clear that until Lloyd's makes payment under Policy Number MC10ACXU it cannot subrogate and is not a real party in interest to this case.

Accordingly, it is recommended that Triple–S' request to dismiss Lloyd's claim be **GRANTED.**

## CONCLUSION

In view of the foregoing, it is recommended that Plaintiffs' Motion for Summary Judgment (Docket No. 45) be **DENIED** and that Triple–S' Motion for Summary Judgment (Docket No. 52) be **GRANTED.**

IT IS SO RECOMMENDED.

Since the Court has already scheduled a Pretrial Conference in this case for September 5, 2013 and Jury Trial is set for September 16, 2013, the period of time to file any opposition to this Report and Recommendation needs to be reduced. As such, the parties are granted until **Sep-**

---

14. Whether a check was issued and received by Economy for the damaged compressor and for $25,000.00 for the spoiled goods as asserted by Triple–S is unclear as the letter submitted in support of Triple–S UMF ¶ 18 states, in its pertinent part, "[p]lease sign and notarized the 'Proof of Loss' document and return it to Triple–S Property, in order to proceed with the corresponding payment." (Docket No. 53, Exhibit 4, p. 1).

tember 5, 2013 to file their simultaneous opposition, if any, unless they first seek and obtain an extension of time from the Presiding District Judge.

In San Juan, Puerto Rico, this 28th day of August of 2013.